(Surrogate's Court, Chautauqua County. October 20, 1894.)

1. WILLS—UNDUE INFLUENCE.
  Where decedent, up to her last sickness, had been very strong bodily and mentally, and made a will according to her previously expressed in-

tentions and duty 28 hours before her death, and afterwards, about 8 hours before her death, while unable to move or speak, executed another will, without mentioning the former will, probate of the second will be denied on the ground of undue influence.

**2. EVIDENCE—PROOF OF AGE.**
Evidence that witness some years before had heard the deceased husband of testatrix say that she was then of a certain age is sufficient to prove her age at the time she executed the will.

**3. HUSBAND AND WIFE—ESTATE BY ENTIRETIES.**
A conveyance to a husband and wife creates an estate by entireties.

Proceeding for the probate of the will of Bridget Fox, deceased. Denied.

James I. Fowler, for proponent.
Walter L. Sessions, for contestant.

SHERMAN, S. The testatrix died at about 11 o'clock on January 12, 1892, leaving no real estate, but personal property, as alleged in the petition, of the value of about $600, and leaving no husband or next of kin, and no heirs. Her former husband, Martin Fox, died intestate about 17 years before, leaving, by his first wife, two sons, residing in Ohio, and one daughter, said Honora Fox, the contestant, residing in Jamestown, N. Y. Warren D. Shaw and wife conveyed to Martin and Bridget Fox, for the consideration of $150, by deed dated May 14, 1863, about one-quarter of an acre of land in two adjoining village lots on the Warren road, so called, leading from the then village of Jamestown to Warren, Pa.; and said Bridget Fox, after the death of her husband, Martin Fox, sold and conveyed the same land on November 18, 1890, to John Wood and Martha, his wife, for the consideration of $300, reserving, however, the use and possession of the north half of said premises, and also subject to the payment by said Wood of the unpaid taxes thereon, same being a part of the consideration in addition to the $300, and the amount of the said taxes was not proved. The north half of said premises of which the use was reserved to the said Bridget Fox during her life had a small house or shanty, 12 by 16 feet, thereon, of little value, with two rooms, which she occupied at the time when said deed was made, and up to the time of her death, on January 12, 1892. Said Warren D. Shaw and wife conveyed to said Bridget Fox another village lot, adjoining the above two lots, on April 20, 1860, when she was a single woman, unmarried; and after her marriage to Martin Fox, and after his death, she conveyed the same to John Davidson, who was a witness to her alleged will here contested, for $600 paid down. The decedent signed the instrument propounded as her last will, by making her mark, at about 4 o'clock in the afternoon of the same day she died,—being about seven hours before her death, —and by such will, by its terms, she devised and bequeathed to the Reverend Richard Coyle, rector of the Catholic church in the city of Jamestown, all her real and personal estate, subject to the payment of her debts and burial expenses, and appointed said Rev. Richard Coyle sole executor thereof, and revoking all former wills by her made; and the same was witnessed by James I. Fowler, Esq.,

and said John Davidson, both of Jamestown, N. Y.    Notice of probate of such alleged will was duly served upon the attorney general of the state and the county treasurer of said county, neither of whom appeared in proceedings on probate.    The above-named Honora Fox made answer, contesting the will upon the grounds that the testatrix was of unsound mind when she signed it, and that she was induced to sign it by the undue influence of said Rev. Richard Coyle and others.    It appeared from the evidence on part of the contestant that the decedent had a few minutes past 8 o'clock on the evening of January 11, 1892, signed another instrument, purporting to be her will, which was witnessed by Margaret Donlon, wife of John Donlon, C. W. Creal, and Mary Higgins; and such alleged will purported to give, devise, and bequeath all her property, both real and personal, to the above-named contestant, Honora Fox, commonly called "Nora," and appointed said Margaret Donlon executrix thereof.    The learned counsel for the proponent claimed that the deed of this property by Warren D. Shaw and wife, dated May 14, 1863, to Martin Fox and Bridget Fox, his then wife, conveyed the property to them as joint tenants, and that upon his death she became the owner of the property in fee, as his survivor.    The learned counsel for the contestant claimed that Martin and Bridget Fox were only tenants in common, and that upon his death the property descended to his heirs, Honora, William, and Michael Fox, children by his first wife.

I hold and decide that under the common-law rule applicable to this case, when land is conveyed to husband and wife, they do not take as tenants in common or as joint tenants, but each becomes seised of the entirety per tout, and not per my, and that upon the death of either the whole descends to the survivor.    Bertles v. Nunan, 92 N. Y. 152, overruling Meeker v. Wright, 76 N. Y. 262; Zorntlein v. Bram, 100 N. Y. 12, 2 N. E. 388.    I hold that upon the death of Martin Fox, intestate, his wife, Bridget, became seised in fee of absolute title to the entire premises.

James I. Fowler, attorney for the petitioner, and one of the witnesses to the will of January 12, 1892, testified that he drew the will in question; that he went down to the little house of the decedent in the afternoon of the day the will was drawn; that he went into the room, up to the bed, and asked Mrs. Fox if she knew him, and she reached out her hand, and gave an expression of "Yes," shook hands; that he asked her, he thought, if she wanted her will made; that she said "Yes;" that he asked her to whom she wanted her property left; that he called in Mr. Davidson, and then asked her again, and she said, "Father Coyle;" that he read over to her the will which he had drawn, and asked her if that was right; that she replied that it was; that he then asked her, he thought, if he should sign her name, that he knew she could not write, and she said, "Yes;" that he sat at the table, and wrote her name, and told her to sign by making her mark, which she did; that he then asked her if she acknowledged that to be her last will and testament, to which she replied, "Yes;" that he then asked her if she desired Mr. Davidson and himself to act as witnesses; that he and the other witness,

Davidson, then signed their respective names; that he asked her if he should take the will, or what she would have done with it; that she said she desired that he should take it; that he thought she was perhaps 80 years of age, or about that; that he thought she was of sound mind and memory, and with full knowledge of what she was doing; that the will was then in the same shape that it was the day it was drawn. On his cross-examination by Mr. Sessions the witness testified that he went up there with the idea of making the will in the forenoon; that Mr. Davidson requested him to go up, and that Mr. Davidson told him the old lady had sent down for him to come up and draw her will; that this was on January 12, 1892; that he went up there, and made inquiries regarding her health, that morning, and rapped at the door, on the outside; that Mrs. Margaret Donlon came to the door, and stepped out, and closed it, and that he told her that he was there to draw Mrs. Fox's will, and that she made some reply, which he did not understand; that he asked her, "Isn't Mrs. Fox able to?" and that she said, "Oh, no," that she was not in her right mind, and could not see anybody, and some other expressions; that he said, "Why, I understood she sent for me;" that Mrs. Donlon said her will was made; that he said, "Who made it?" and she said, "She had a lawyer;" that he saw that she was not inclined to admit him into the house; that he came down, and met Mr. Davidson, and witness said to Mr. Davidson that they told him that she had a will, and that there was no use of staying, and that he went home; that he was not satisfied that she was not in a condition to make a will. To the question, "Didn't you state at the time that the will would not be worth a snap of your fingers?" witness replied, "I don't know." To the question, "Didn't you ask permission to go in?" the witness answered, "No more than I stated what I had come for." To the question, "Didn't she tell you that she was dying?" witness answered: "I don't know as she used that expression. She gave me the impression that she did not know what she was about, and that she had her will made." The witness further testified that Mrs. Margaret Donlon did not tell him to whom the old lady had willed her property; that he (witness) drew the will from what Mr. Davidson had told him, and not from anything Father Coyle had told him; that he never had any conversation with Father Coyle whatever on the subject; that Father Coyle was the priest in the city there, over the Catholic church, for many years; that up to the time the witness went there, in the evening, he had no directions from any one how the old woman wished to dispose of her property, except as Davidson had told him; that Mrs. Fox was in bed, and did not get up, or raise up on the pillows; that he asked her if she knew him, and she spoke loud, and answered, "Yes," and put out her hand, and shook hands with him; that he found her in a very weak condition; that she signed the will, and he held the pen, and she put her hand on the top of the pen, as witness held it, while she held the top of the pen; that he did not regard her as very weak in mind, and thought she comprehended everything; that she had been a woman of very strong mind, and strong physically; that he did not know how long she had been

confined to her bed and unable to move; that she did not say any-
thing to him about the will she made the day before, or anything
that day, about her property,—whether it was real or personal;
that he considered her in a condition to tell where her property
was, and of what it consisted.   The witness further testified that
she had wished him to keep her old papers for her; that she had
notes and a certificate; that she had handed them to him to keep
in his safe as much as a year before,—he thought, along in Decem-
ber, 1890.   On the redirect examination Mr. Fowler testified that
the will was drawn about 11 o'clock a. m., January 12, 1892; that
he went and rapped at the door; that the little house stands back
from the sidewalk about 15 or 20 feet; that the conversation he
had with Mrs. Donlon was with her standing in front of the door,
which was shut; that Mr. Wood and Mr. Davidson were not with
him; that after he had the conversation with Mrs. Donlon, as de-
tailed by him, and some of it by her, he met John Wood coming
across the street from his house.   The witness further testified as
follows: "I met him near the junction of the sidewalks, and also met
Mr. Davidson."   And he stated to them what Mrs. Donlon had told
him,—that the old lady was not able to see any one; that they said
she had a will.   And witness said, if she had one, that was enough,
—all that was necessary.   And with that he left, and came home.
Mrs. Donlon stated, in response to his question as to the old woman,
that she was not right, and did not know any one, and could not do
anything.   She said that a lawyer drew the will, and that it was all
right.   He told her that, if she had one will, that was sufficient.
That he met Mr. Davidson and John Wood on the walk.   That he
had been acquainted with Bridget Fox for a great many years.
She had come to him one time and another, when she wanted ad-
vice, and he had given it to her, and he had sent word once or twice
to the old lady about her land,—that he had seen it advertised
for taxes, and that she ought to look after it.   After that, for an-
other party, he had looked in the surrogate's office, for his own satis-
faction, and saw there was no will of Martin Fox.   That he went
to the county clerk's office, for his own satisfaction, and found that
the land where the old lady lived was conveyed by Warren D. Shaw
and wife to Martin and Bridget Fox, his wife, "and on my return
home I sent word by Mr. Davidson to tell the old lady that the land
where she lived belonged to her."   On the same day, or the next
day, after looking this up (he thought, in November), he told the
old lady he had looked it up, and found at Mayville that the land
where she lived belonged to her absolutely; that it was conveyed
to her husband and herself, and after his death she took his title
absolutely.   Witness testified:   "Said I, 'Mrs. Fox, take the land you
have, mortgage it or sell it, and use it the best you can for your own
support.'"   It was upon that occasion, or subsequently, when she
conveyed the lot, that he told her to use the avails of what she had
for her own enjoyment, and then leave it to her friends and rela-
tives.   He further testified:

"The expression of the old lady to me was that all she wanted was to
carry her through; that 'a divil a one of them' had ever darkened her

doors. I didn't ask her who or what. I thought the old lady knew what she was saying. On the sale of the land, subsequently made, I think she handed me the papers she received, or some notes, and asked me to put them in my safe, and keep them for her; also, what Mr. Davidson had, which I still hold."

Witness further testified, on cross-examination by Mr. Sessions, that he did not think, considering the age of Mrs. Fox, that in the sale to Mr. Wood she reserved one-half the life use of the property; that, according to the rule of probabilities, it would affect the value much, and that the land had been sold several times for taxes; and that a party who came to him said that parties had been trying to sell him tax titles.

John Davidson, the other subscribing witness to the will dated January 12, 1892, testified that he had resided opposite to Mrs. Fox's house for 13 years, and had known her all that time; that he saw her make her mark to the will presented, dated January 12th, and was present when she answered, as Mr. Fowler asked her to whom she desired her property to go, and she said, "Father Coyle," and she acknowledged that to be her last will and testament, and he was present when it was read over by Mr. Fowler, and when she asked him to subscribe as a witness; that he subscribed his name as a subscribing witness at her request, and she acknowledged that to be her last will and testament; that the will appeared then as it did the day it was drawn, and that he was present when Fowler asked her if he should take the will, and she said she wanted him to keep it; that he thought she was of sound mind at the time it was signed, and that she knew what she was doing, and what was being done; that he should say that she was about 80 years old; that he went down after Mr. Fowler the morning of the day the will was drawn,—went from his own house; that he had not been at Mrs. Fox's house that morning, and that he did not know her condition, and went along with Mr. Fowler to the house; that he had not seen her that day at the time; he told Mr. Fowler that morning that the old lady wanted to will her property to Father Coyle, that she wanted him (witness) to come over to the house before she was taken so sick, and handed him a little money she had in a box, and said, "I want you to keep that," and that he told a woman who was in the house to see what was in the box, and that he said to Mrs. Fox, "What do you want to do with the money you have?" and she said, "To Father Coyle, and her bed to Mrs. Callahan." Witness testified that up to the day the will was made he had never had any more conversation with her, except at the house, while she was in bed, in the presence of Thomas Conway and Mrs. Donlon; that he went to see the old lady, just to see how she was, and that he was not called in to take care of her; that he and Conway went in together, and that he did not talk to the old lady then about what she should do with her property; that he did not see Mrs. Higgins there; that Mrs. Donlon was there all the time he was there; that he asked Mrs. Fox if she knew him, and she said, "Yes;" that this was the day she died, between 1 and 2 in the afternoon; that she knew him, and she said, "How's Mrs. Davidson?" and that he said she was getting bet-

ter; that he asked her if she wanted to see Mr. Fowler, and she nodded three times that she did; that she could not speak loud, but so that he could hear her. The witness testified that there was nothing more said while he was in the room; that Mr. Conway was there, and that they had stayed about 10 minutes, and that witness had given all the conversation that had occurred while he was there; that he had no other talk with any other person about the property. Witness further testified as follows: "Father Coyle told me that he did not want anything to do with this property, and if he was administrator he would give the property to Honora, the daughter." That he did not know that Father Coyle was at Mrs. Fox's house on Sunday, January 10th, nor that he was there Monday, January 11th, or that he was there Tuesday, January 12th. That he had not learned from Father Coyle or the old lady that he was there the day the will was made. The witness, on cross-examination, testified that he had lived beside Mrs. Fox for 13 years, and that he had bought a piece of land of her 12 years before,—one common town lot, of which he could not state the width; that he gave her $600 for it, and that the money was then (at the time of testifying) in Mr. Fowler's hands ($301.75); that he was present when it was paid; that he left the money with Mr. Fowler, and he had paid the balance of $600 to the old lady when she wanted it; that Mrs. Fox had handed the money to witness, and said she wanted him to keep it, and that he said that, as Mr. Fowler had a safe, it would be better to give it to him; that the old lady came over and got a few dollars as she wanted it. Here Mr. Sessions, presenting a check to witness, dated October 12, 1880, asked witness: "Did you give that check on the bank for $50 and interest? Answer. Yes, sir; that was about the time I bought the lot." The witness testified that the money was not in the bank to pay the check; that the check had never gone to the bank, and that he had paid the money to her; that he had signed the check for her. The check was offered in evidence, and read, under objection by Mr. Fowler that it was immaterial and improper evidence, with exception to proponent, and the following is a copy of the check read in evidence:

Jamestown, N. Y., Dec. 12, 1880.

Chautauqua County National Bank.

Pay to the order of Mrs. Fox...................................or bearer fifty .......................................................................dollars, and interest at six per cent., for value received.

[Signed]          John Davidson.

The witness further testified that Mrs. Fox owned the lot she lived on, and that there was a house on it; that she sold it in November, 1890, to John Wood; that the lot was of the same width as his lot; that she lived on that lot in a shanty 12 by 16 feet, with two rooms in it, one a small bedroom; that she had no other real property besides that lot, and that he did not know what Wood gave for it; that the money she received for it was in Mr. Fowler's hands; that there were back taxes to be paid on the lot; and that Mr. Fowler had the money. On the redirect examination by Mr. Fowler, witness tes-

tified that from the time he lived there the old lady had called upon him for what money she wanted for her living; that there was no one else to look after her and do for her; that he had purchased for her every year since he had bought the lot; that he had settled on his deal, and looked over with her as to what was owing during that period, and that the money that Mr. Fowler then had was the balance that was her due when they looked over the last time; that she had had a bond and mortgage, and had discharged that, and had taken a note; that he never saw John Donlon there to help or assist the old lady but once, when Donlon brought some wood there; that John Donlon had moved the things out of the house after her death, and had got the key to get the goods, and had taken them; that Father Coyle told Mr. Conway to get the wood and things there; that the witness had seen Donlon taking the things away; that the first he knew of Mrs. Donlon's being there to take care of the old lady was when she was sick; that Martin Fox had two sons and one daughter by his first wife; and that Bridget Fox had no children of her own.

Only the two above-named witnesses, Messrs. Fowler and Davidson, were sworn on part of the proponent, and their evidence appears above substantially as given. The will was written by Mr. Fowler before seeing Mrs. Fox, or consulting her about it in any way. All the authority he had in drawing the will was received from Davidson. It appears affirmatively that Davidson had no authority from Mrs. Fox or any one else to instruct Mr. Fowler to insert in the will, as drawn, the name of Father Coyle as executor; and there is no evidence in the case tending to show that Mrs. Fox ever gave authority to Davidson to instruct Mr. Fowler to insert in the will, as drawn by him, the name of Father Coyle as sole legatee. He certainly had no such authority from Father Coyle, who told Davidson that he would have nothing to do with the property, and if he had he would give it to Honora, the daughter. Such authority could not be fairly claimed from the conversation between Davidson and Mrs. Fox at her house, before she was taken so sick, on the occasion in which she sent for him to come over there, when she handed him some little money she kept in a box, and said to him, "I want you to keep that," and when he told a lady that was in the house to come and see what was in the box; and Davidson further stated, "I said, 'What do you want to do with your money you have?' and she said, 'To Father Coyle, and her bed to Mrs. Callahan.'" There was no evidence of the amount of money in the box. Mrs. Fox evidently intended to have Davidson pay that money to Father Coyle, and evidently Davidson so understood it, because no other money was mentioned; and, if he understood differently, why did he not instruct Mr. Fowler to insert in the will "the bed to Mrs. Callahan"?

The evidence of Davidson, given without objection, about having paid the check for $50, dated December 12, 1880, then held by the decedent, and also about his alleged settlement with her for $298.25 loaned to him by the decedent from the balance of $600 purchase price of the land she sold to him in 1880, would not be admissible

in evidence against the estate on judicial settlement of the accounts of the executor or administrator thereof, under Code Civ. Proc. § 829.

It appeared that when Mr. Fowler went to the house of Mrs. Fox, on the forenoon of the day she died, with the will he had previously drawn as directed by Mr. Davidson, he was immediately followed by John Wood, holding a pen and ink in his hand, and who purchased one of the three lots of her in November, 1890, for $300, accompanied by Davidson and Thomas Conway; that Mr. Fowler, after his talk with Margaret Donlon, when leaving met the three above-named persons at the fence in front of the house, where a short conversation was held between them, and all went away except Conway, who was a brother-in-law of Mrs. Fox, who returned and went into the house, and remained there until between 3 and 4 o'clock in the afternoon, going out and in but once or twice, and without making his business known. Mrs. Fox in the meantime was lying on the bed, apparently unconscious, and could not take any nourishment, not even a teaspoonful, and she had been in that condition about nine hours previously, and continued so until between 3 and 4 o'clock in the afternoon, when she called for a drink of water, and Conway, being in the adjoining room, and hearing her call for water, went into the little bedroom, and asked her if she knew him; that Mrs. Fox tried to talk, and made some motion, and Conway kept asking her if she knew him; that after a while she said, "Yes;" that he went over across the street for Mr. Davidson, who came back with him; that they then asked Mrs. Fox if she knew them; that they kept at her until finally she talked to them, and then Conway went after Mr. Fowler, and Davidson said nothing more to Bridget, but remained in the kitchen while Conway was gone; that after a while Conway returned with Mr. Fowler, and they went into the bedroom. The evidence of the two subscribing witnesses to the alleged will as to what then occurred is fully stated above.

C. W. Creal and Margaret Donlon, who were witnesses to the first will, and John Donlon, husband of Margaret Donlon, were the only persons who testified on the part of the contestant. Mary Higgins, who was also a witness to the first will, and who acted as a nurse of Mrs. Fox during her last sickness, was not called to testify. She was employed as nurse by the Helping-Hand Society, so called. It appeared that Margaret Donlon was there for 9 or 10 days during Bridget's sickness, doing the work in the house, and assisting in the care of Mrs. Fox, and that she was requested to go there by Thomas Conway, who told her that he had heard that Bridget was very sick. It appeared from the evidence on part of the contestant that the decedent had in her possession at the time of her death, among her papers, aside from the above check for $50, 14 tax receipts signed by tax collectors, dated at Jamestown, N. Y., from 1865 to 1880, both inclusive, amounting to $46.14, of which 7 were receipted as paid by Martin Fox, and 7 by "Martin Fox's heirs," of which Honora was one, and his two sons in Ohio

were the others. It appeared in evidence that Bridget Fox purchased one of the three lots of Warren D. Shaw and wife on April 30, 1860, taking the deed in her own name, and before her marriage to Martin Fox; that after her marriage she and her husband, on May 14, 1863, purchased the other two lots adjoining the other lot, in partnership, under an agreement between them that each should pay one-half the purchase price of $150; that Martin Fox and his three children above named paid one-half of the purchase price, and Bridget Fox the other half, and that William Fox, the youngest brother of Honora, assisted in building the little house on the property, and that Honora assisted in paying for these two lots, and also in paying the taxes thereon, up to about the time she had a sunstroke, about the year 1871, which greatly injured her mind and body, when she was removed to the county hospital or poor house at Dewittville, in said county, and remained there until 1891, during which year the insane persons in said hospital were removed to the state asylum in Buffalo, N. Y.; that upon such removal, John Donlon applied to Hon A. A. Vandusen, county judge of Chautauqua county, at Mayville, for an order, which he obtained, for the removal of his cousin Honora from the hospital, which he did, and took her to his own house, upon his farm of 44 acres in the town of Busti, about one mile from Jamestown, where she has remained ever since under his care and support, she being then about 46 years old. It also appeared in evidence that Martin and Bridget Fox lived together very happily after their marriage, in their little house on Warren street, until his death, in 1875, and that Honora lived with them, and worked out by the week in Jamestown, until removed to the hospital, using a portion of her wages in paying taxes upon the property, and that John Donlon, who was a nephew of Martin Fox, resided one year with them, being about the year 1869. It appeared in evidence that after Bridget had sold the two lots to John Wood, in 1890, and after Honora had been taken by John Donlon to his house, in 1891, he (John Donlon) called upon Bridget Fox to assist him in the support and care of Honora, and that Bridget told him that she would not, but that she would let Honora have every dollar she had at her death. The evidence shows that very friendly relations existed for many years preceding the death of Bridget Fox between her and John and Margaret Donlon, and that they visited back and forth often. Honora's two brothers Michael and William moved to Ohio about 30 years ago, and never returned, except that William came back to attend his father's funeral, and to remove his body to Ohio for burial. It appears quite evident that the old lady referred, in the testimony given by Mr. Fowler about her friends and relatives having never darkened her doors, to these two stepsons, William and Michael Fox, whom she had not seen for about 28 years, except William, who came to attend his father's funeral, and to take his body away to Ohio. Certainly she could not have referred to their sister, Honora, towards whom she always had the most kindly feelings. Neither could she have referred to her husband's nephew and niece, John and Margaret

Donlon, with whom she had always been on the most friendly terms, visiting each other often.

It should be borne in mind that Mr. Fowler, who drafted the second will of the decedent, and was a witness to it, and who had acted for many years as her friend and adviser, and in whose integrity, learning, and ability she justly had great confidence, and who had always known Bridget as a remarkably strong woman, both in body and mind, but who had not seen her during her last and only severe illness, and had had no knowledge about her illness before going there on the morning of the 12th of January, 1892, except what he had learned from Margaret Donlon, John Davidson, Thomas Conway, and John Wood, as he testifies, went away from the house that morning not satisfied that the old lady was incompetent to make her will; that he drew the will that morning, before going to see her, from what others had told him; that he saw her for only a few minutes at the time the will was signed, in the afternoon; that nothing was said by her at that time about her property, or about having made a will, 20 hours previously, entirely different in its provisions from the one here offered for probate,—that it would seem to appear that Mr. Fowler could have had hardly sufficient opportunity to judge correctly her capacity to make a will.

The evidence on part of the contestant shows, I think, that Mrs. Fox was in a far better condition, physically and mentally, when she made her first will than when, 20 hours later, she made her second one. She sent by Margaret Donlon, who was taking care of her at the time, to see Mr. Creal to come and draw her will. He was sent for because he lived on the second street from her residence, and nearer than Mr. Fowler. That he came, and the other witnesses were in the little bedroom, and when the will had been drawn she raised herself from the pillows, and sat up straight, with the pillows behind her, and with no one to support her, and entered into conversation, and stated that she wanted her will drawn in their presence, and, in answer to the questions put to her by Mr. Creal, stated that she wanted to give her property to Honora Fox, who was a daughter of her deceased husband, Martin Fox, and that she wanted Margaret Donlon, who was a niece of her said deceased husband, to be the executrix thereof; that she wanted Mr. Creal, Margaret Donlon, and Mary Higgins to be witnesses to her will. That after the will had been prepared, and she was sitting up in bed, she took the pen in her hand, and wrote her name to it, Margaret Donlon guiding her hand while doing so, at her request. Mr. Creal testified that Mrs. Fox appeared very bright in her mind at the time, he thought, for one suffering so much pain as she was; that he asked her where the pain was, and she put her hand to her left side; that he thought she was of sound mind and memory, and competent to make a will; that Mrs. Donlon gave her a cup of milk when she first sat up in bed, before she signed the will; that she declared it to be her last will and testament, in the presence of witness and in presence of Margaret Donlon and Mary Higgins, and requested them to sign it in her presence and in the presence of each other; that, when he first went into the room where Bridget Fox

was, Mrs. Donlon was present, and Mrs. Donlon then said, in pres-
ence of witness, that Father Coyle had been up there, and that she
(Bridget) had made her peace with God, and that she had requested
her last will and testament should be in favor of Honora; that, after
the will was signed by Mrs. Fox, Mrs. Donlon asked her if she would
like to have Mr. Creal keep the will, and she said, "Yes." Then he
(Mr. Creal) took the will away with him, and kept it until he de-
livered it to the surrogate. The witness further testified that Mrs.
Fox, at the time, seemed to him to know every word that was said,
and what was being done.

Margaret Donlon, a witness to this alleged will, and the executor
named therein, testified: That she was the wife of John Donlon,
of the age of 40 years; had known Bridget Fox for 23 years; and
that she had always lived in the same place where she died, and was
at her house often during the time she knew her. That she lived
near her, and was well acquainted with her, and had been to her
house a good deal during that time. That she knew Martin Fox
very well during five years, until he died. That the relations be-
tween Martin Fox and Bridget Fox were always pleasant. That
she knew Honora Fox during the time she lived on Warren street.
That she knew she lived with them and made it her home there
until she went to the asylum. That up to that time Honora Fox was
a strong, healthy girl, and worked out for people in the city. That
Martin and Bridget Fox were at witness' house in Busti during the
year he died, going on 18 years ago. That witness scolded Martin
for putting Nora in the asylum, and Mr. Fox told witness, in his
wife's presence, that he wanted witness to take care of Nora, and
that after his death he wanted Nora to have what belonged to him;
that Bridget was always a good wife to him, and after she was
through with it he wanted all to go to Nora. Bridget said in reply that
she was satisfied with that. Bridget used to come out and see witness,
and said that she was well satisfied with that. That witness was
the first person called when Bridget was taken sick. That Conway
told her that she was very sick, and that he would be glad to have
her go over. That this was 9 or 10 days before she died. That
witness stayed right along every day, and nights, between times,
doing the best she could, and that Bridget was very glad to have
her. That Mary Higgins was there as a nurse. That Father Coyle
was there the Sunday night before Bridget died, being the Sunday
night before the first will was drawn, and that he was in the bed-
room with her, alone, a few minutes, with the door shut. Witness
testified about Mr. Fowler, Davidson, and Conway being there on
Tuesday, January 12th, in the morning; that Mr. Fowler asked wit-
ness how Bridget was; that she told him that she had been dying
since 7 o'clock that morning; that during that day the old lady
could not talk at all,—could not take any nourishment, even a tea-
spoonful. She further testified that the old lady never spoke a word
after Mr. Fowler and the others went away; that she died at half
past 11 o'clock that night, and she took no nourishment; that she
had taken no nourishment after 7 o'clock on the morning of the day
she died.

Three witnesses testified as to the age of Mrs. Fox at her death, in 1892,—the first, Mr. Fowler, that he thought she was then perhaps of about 80 years of age. The second witness, Mr. Davidson, testified that he could not tell her age,—that she was about 80, he supposed. The third witness, John Donlon,—a credible witness, and a nephew of Martin Fox,—testified that he heard Martin Fox say in 1870 that his wife, Bridget, was then of the age of 70 years, which would make her age at her death, in 1892, over 91 years. I hold that the evidence of the last-named witness clearly and legally establishes the age of the decedent, at her death, to have been over 91 years. 1 Greenl. Ev. (Redf. Ed.) §§ 103, 104; Doe v. Griffin, 15 East, 293, and other cases cited under said sections 103 and 104 of Greenleaf's Evidence.

An important and controlling question arises in this case as to whether the alleged will of the decedent accords with her duties and obligations to her stepdaughter, Honora Fox, and with her former and often-declared intentions, while rational, to make Honora, at her death, the sole beneficiary of her bounty. The evidence in this case is all in one direction, in favor of the contestant, as are also the authorities in harmony therewith and with good sense. In re McCarthy (Sup.) 20 N. Y. Supp. 581; In re Raynor (Sup.) 18 N. Y. Supp. 426. The above two cases are very similar, in the facts stated, to this. In re Coop (Surr.) 6 N. Y. Supp. 664; In re Budlong (Sup.) 7 N. Y. Supp. 289. The evidence shows that Bridget Fox was remarkable for her great vitality; that she was strong in both body and mind up to within 10 days of her death. There is no evidence tending to show that she had ever been sick a day prior thereto, but that, like Holmes' famous "One Hoss Shay," she, in the end, went to pieces very suddenly. The Reverend Richard Coyle did not appear personally at any time in the proceedings for probate before the surrogate. Seven days after the death of the decedent, he signed a petition for the probate of her alleged will, doubtless in good faith, and under the advice of counsel.

I hold and decide that Bridget Fox, at the time of signing said alleged will, was not of sound and disposing mind; that her signature thereto was procured by the undue influence of John Davidson and Thomas Conway, and not by any undue influence on part of Rev. Richard Coyle, as alleged in the contestant's answer; and I direct decree herein denying probate of such alleged will, with such reasonable costs to the contestant, including fees of stenographer, as may be allowed by the surrogate, on notice of adjustment to the proponent, and also such reasonable costs to the proponent as may be allowed, in the discretion of the surrogate, upon like notice to contestant; such costs payable out of the estate.